p 1/19

FILED

United States District Court
for the
Northern District of Indiana
1300 S. Harrison Street
Fort Wayne, Indiana 46802
Telephone: (260) 423-3000

2010 JUL 15 AM 11:25

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

| | |
|---|---|
| Amy and James Ortega,<br>Plaintiffs, | |
| v. | Complaint for Breach of Contract and Copyright Infringement |
| Forks RV (aka Continental Coach, aka Forks International)<br>Daryle Bontrager,<br>Howard Stutzman,<br>Jay Troyer<br>Defendants. | HON.<br>Case No. 1: 10CV227 RLM |

James and Amy Ortega, by and through their attorney, Amber Beebe, file this Complaint for Breach of Contract and Copyright Infringement and alleges as follows:

JURISDICTION AND VENUE

1. James and Amy Ortega are foreign plaintiffs as residents of Missouri with their place of domicile located at 4923 East 13th Street, Joplin, Missouri, 64801.

2. The defendant Forks RV is a Domestic company with its principal place of business located at 11280 West US Highway 20, Shipshewana, Indiana in LaGrange County. It is also incorporated in and doing business in Shipshewana, Indiana. The individual plaintiffs reside in and are domiciled in the Northern District of Indiana.

3. Venue in this District is appropriate because the events that gave rise to the plaintiff's claim took place in Shipshewana,

Indiana, and through electronic and telephonic communication between the plaintiffs and the defendants in their respective states.

4. There is diversity of citizenship and the amount of Plaintiff's claim excluding interest and costs exceeds $75,000.

5. Plaintiff files this action in the District Court of the State of Indiana, this Court having original jurisdiction in accordance with 28 U.S.C. §1332 and in the Northern District of Indiana pursuant to 28 U.S.C. §1338 (a).

**THE PARTIES**

6. The plaintiffs, James and Amy Ortega, are residents of the state of Missouri and are in the marketing and sales business.

7. At the time of the filing of this complaint the defendants, collectively Forks RV, were incorporated in Indiana, with its principal place of business at 11280 West US Highway ,Shipshewana, Indiana, and is a manufacturer and up-fitter of recreational vehicles. The individual defendants Daryl Bontrager, the president of Forks RV, Howard Stutzman, the co-owner of Forks RV, and Jay Troyer, a co-owner of Forks RV, are all domiciled in Middlebury, Indiana according to a public records search. The individual plaintiffs also list the business address for Forks RV as an alternative personal address.

8. The individual defendants have personal knowledge of the activities giving rise to this complaint, were all acting as agents of Forks RV within the scope of their employment, and benefitted from their actions as owners of the company. All three individual defendants were personally involved in the issues in this case and dealt directly with the plaintiffs.

## THE FACTS AND PRESENT CONTROVERSY

9. The plaintiffs are experienced in marketing and sales in the recreational vehicle and equine industry.

10. On or about June 2009, while in Indiana getting a motor home upgraded for one of their customers, the plaintiffs stopped by the Forks RV plant to look at their fifth wheel unit products and spoke with Jay Troyer.

11. While at the Forks RV plant in June 2009, the plaintiffs spoke with the defendants about how the fifth wheels could be used in the equine market with some design changes and adjustments. This began an ongoing relationship between the plaintiffs and defendants.

12. Over the next month, through June 2009 and July 2009, the plaintiffs stopped by the Forks RV plant to see the progress that the defendants were having in building a RV fifth wheel for a man named Mr. Nichols, an RV dealer. During this time the plaintiffs and defendants were discussing the possibility of working together by having the defendants build a unit based on the plaintiffs' suggestions and design in an attempt to market within the equine RV industry.

13. Throughout late June 2009 and July 2009, the plaintiffs and defendants exchanged numerous emails and had discussions about working with the plaintiffs in the promotion of a new equine unit. The parties exchanged information but had not yet discussed pricing.

14. During the time period mentioned in clause number 13, the plaintiffs were invited back to the Forks RV plant to see the progress made on the unit for Mr. Nichols.

15. At some time in August 2009 the defendants had a "falling out" with Mr. Nichols and owed Mr. Nichols $50,000.

16. The plaintiffs were asked to and agreed to take the unit that was being built for Mr. Nichols to try to market and sell for Forks RV, preferably in the equine market.

17. The plaintiffs agreed to take the unit (hereinafter "the demo") but told the defendants that the unit needed several modifications in order to be used as a horse trailer. The plaintiffs also told the defendants that they were more interested in marketing and selling two *new* units.

18. The defendants originally stated that it wanted to get rid of the demo and try to recoup the invoice price from it. The plaintiffs agreed to help them to do this if they were reimbursed for their expenses and were also allowed a profit from the sale of the unit. Defendants agreed and the unit left with the plaintiffs.

19. Simultaneously with the events of clause 18, Forks RV and the plaintiffs were discussing designs and pricing for two more units.

20. The plaintiffs, after discussing the MSRP and other items with the defendants, decided to market the demo unit at an equine show.

21. While at the first equine show, Forks RV decided that it would rather the plaintiffs did not sell the demo but to instead take it to several shows and take orders for new units. The plaintiffs agreed to do so.

22. While at the first show, the plaintiffs discovered several flaws and also that the manual that had been placed in the demo was not the appropriate manual for the demo. The plaintiffs relayed this information to defendants.

23. The plaintiffs repaired as many of the flaws as possible so that they could continue to show the unit without incident.

24. While showing the unit for the defendants, the plaintiffs began taking orders for new units.

25. Plaintiffs sent requests for pricing and floor plans to defendants when showing the demo so that they could relay this information to the interested customers.

26. The defendants did not have sales order forms, quote sheets, standards and option lists, or other documentation that could be used by the plaintiffs to give to potential customers so the plaintiffs designed their own that Forks could use. Meanwhile, the plaintiffs continued to email the defendants about the need for these items presently and in the future in order to fulfill orders.

27. From late July and on, the parties were discussing a second unit (hereinafter "Ortega 1") to be built for plaintiffs and other orders for other customers retained by the plaintiffs.

28. In September 2009, the plaintiffs had two more customers interested but the plaintiffs were having trouble getting the interior décor options, floor plans, and other items needed to show the customers from Forks.

29. The parties had agreed that the plaintiffs were capable of obtaining at least two new equine customers a month and the defendants stated that they were capable of building two properly built equine units within 8 weeks time. The plaintiffs had placed other business on hold to promote the Forks demo unit and in expectation of a continuing relationship with the new units.

30. The plaintiffs sent an email to Forks (Jay Troyer) listing the shows that they would attend to promote the unit through October 31, 2009.

31. In September, Forks began to express the fact that it was having monetary problems and that it still owed Mr. Nichols $50,000. Mr. Nichols, in turn, owed this money to a man named Mr. Aldridge.

32. Forks RV asked the plaintiffs whether they knew any investors that could help financially.

33. The Plaintiffs mentioned to Forks that investors did not typically like to get involved with projects for amounts less than $250,000 and Forks wanted $50,000. The plaintiffs also mentioned that investors would charge a high interest rate in order to loan money for a project with such a low return.

34. The plaintiffs' brother, Brad, was approached as an investor and he agreed to loan the money to plaintiffs with 25% interest but did not want to have any involvement with the demo due to its apparent manufacturing defects that required constant repair by plaintiffs. After further discussion, Brad decided to loan a total of $59,509 to plaintiffs as an investor with an expectation of half of the profits and he would share half of the expenses.

35. The money/loan from Brad was given to defendants by the plaintiffs towards the demo with the understanding that the demo was collateral and the $59,509 would be repaid prior to the defendants receiving invoice.

36. It is believed that Forks RV used the loaned money to repay Mr. Nichols.

37. September through October 2009, the plaintiffs were trying to finalize sales for customers interested in purchasing units and were struggling to hold onto orders because Forks was slow to respond to requests for pricing, floor plans, and other information.

38. Forks was using the plaintiffs designs and due to the plaintiffs' experience with and research of units in the equine RV industry, Forks was also taking their suggestions on layouts and additions.

39. In October 2009, the plaintiffs were still waiting for the Ortega 1 to be completed as well as two other units for two customers obtained by the plaintiffs. The Ortega 1 was the new 2011 demo for

the Ortega's to use and the first demo would be sold upon its completion.

40. One of the units to be built was for a customer by the name of Purdin.

41. Purdin's order, which was initially priced incorrectly by Forks, was supposed to be completed by February 1, 2010 in time for a horse show that she would be attending.

42. The plaintiff's travelled to the Forks RV plant on three different occasions from wherever they were in the country in order to pick up the Purdin unit after being told it would be ready only to find out that it was not ready to leave the plant.

43. The Purdin unit missed its deadline for completion three times and was delivered to the customer late causing the plaintiffs to lose profits, pocket large expenses, and harming their relationship with the customer.

44. The plaintiffs almost lost the Purdin customer and lost other customers due to delays, problems with workmanship, and other flaws with the demo unit.

45. Sometime in November 2009, Forks unilaterally excluded the plaintiff's investor Brad (causing their earlier agreement to fail) and raised prices on the units making it more difficult for plaintiffs to make sales. The loaned monies were never returned to the plaintiffs by Forks.

46. On or about December 2009 another order failed due to an issue with the weight of the haulers that Forks repeatedly failed to fix despite plaintiffs' counsel on this and other manufacturing defect issues.

47. In December 2009, Forks was still adamant about disallowing the sale of the demo until Ortega 1 was complete, however, the plaintiffs were becoming weary and wanted to sell the unit (with the repairs that had been made) so that they could recoup the monies that they had already expended and realize some profit.

48. In November 2009, the plaintiffs continued to deliver show schedules and also began to send expense reports (once Brad was excluded) to the defendants because defendants now wanted to be "the investor" and the manufacturer despite their monetary issues.

49. The defendants would not repay half of the expenses as they agreed to do and they took the role of investor from Brad so that the plaintiffs then owed Brad 25% interest.

50. In December 2009, the plaintiffs continued showing the demo (that they were not allowed to sell) despite the fact that they had not yet been reimbursed for any expenses, including repair expenses, were incurring more expenses every day to show it, and despite the fact that there were people interested in buying.

51. Throughout the time periods in the aforementioned clauses, Forks RV was sending regular RV leads to the plaintiffs, providing them with certificates of insurance and new tags for the demo unit,

acknowledging the delays, accepting show schedules, and complimenting them on a job well done.

52. At some point in February 2010, Forks decided that it wanted to receive profits from the sale of the Purdin unit instead of the invoice cost as originally agreed.

53. In early March 2010 some progress pictures were sent from Forks to the plaintiffs for the Ortega 1 unit.

54. In early March 2010, more potential orders were received by the plaintiffs and shared with the defendants and the parties discussed the possibility of getting an investor for the "Ortega 2" unit.

55. In March 2010, subsequent to the events of clauses 53 and 54, the plaintiffs got investors willing to walk through the Forks plant but Forks would not allow it.

56. In March 2010, the demo unit caught on fire from a faulty braking system as the plaintiffs were leaving a show in Houston.

57. Despite faults with units and failure to fulfill orders, failure to allow potential investors to visit the plant, Forks RV continued to pressure the plaintiffs for money and refused to reimburse for expenses.

58. In April 2010, the plaintiffs were still working hard to sell the demo.

59. In April 2010, without speaking to the plaintiffs about it first, the defendants took the Ortega 1 2011 model that plaintiffs had designed and put it for sale online at "Horse Trailer World" hurting the plaintiffs' ability to further market the unit and incorrectly pricing the unit.

60. By Mid-June 2010, the defendants completely stopped cooperating with the plaintiffs, refused to reimburse expenses, adopted the plaintiffs' designs, and utilized the customer base and knowledge received from the plaintiffs to sell directly to the public.

## Count I - Implied in fact Contract

61. Plaintiffs incorporate and re-allege paragraphs 1-60 and state further that the plaintiffs conferred the following benefits upon the defendants without compensation:

a. Obtaining a new and ongoing customer base for Forks RV;

b. Promotion of Forks RV as a manufacturer in both the fifth wheel RV market and equine market to wit:

   1. Online marketing
   2. Word of mouth
   3. Shows
   4. Trade publications
   5. Photos
   6. New market promotion in equine industry

c. Preparation of quotes, sales order forms, and other documentation;

d. Investment monies;

e. Market research and pricing;

f. Repairs to demo unit;

g. Design work and suggestions;

h. Sharing existing customer connections;

i. Risk aversion on demo unit;

j. Customer service.

62. The defendants had knowledge of the benefits and accepted them to wit:

a. The defendants exchanged information back and forth with the plaintiffs in an effort to market and sell the demo, and discussed plans for further units;

b. The defendants received show schedules and expense reports from plaintiffs;

c. Defendants encouraged the plaintiffs to get investors on board;

d. Defendants used the designs made by plaintiffs;

e. Defendants accepted an amount of $59,509 from plaintiffs;

f. Acceptance by defendants of emails showing expenses for equipment purchased to promote the Forks units;

g. Forks encouragement to the plaintiffs to continue to use

the demo unit for shows until the 2011 Ortega 1 unit was complete;

h. Forks worked with plaintiffs on build schedules;

i. Acceptance of show schedules;

j. Forks sending new tags and certificates of insurance to the plaintiffs while they were on the road promoting the unit;

63. The defendants accepted and retained the benefits to wit:

a. Forks used plaintiffs' designs and floor plans for its 2011 unit and continues to market the product online and at shows;

b. Forks benefitted from the sales forms and other documents prepared by the plaintiffs, the market research conducted plaintiffs, and the repairs made to its demo so that it could continue with the show schedule;

c. Forks is now in the equine market for the first time as a direct result of the efforts of plaintiffs;

d. Forks never returned the $59,509 it was loaned and did not pay the expenses it promised;

e. Forks has given the completed Ortega 1 unit over to an individual named Mr. Nichols to display for sale at shows presently;

f. The unit designed by plaintiffs is also listed for sale online and the plaintiffs have been cut off from benefitting from its sale.

64. Based on the foregoing, the circumstances make it unjust for the defendants to retain the benefits without compensating the plaintiffs.

COUNT II - Copyright Infringement

65. The plaintiffs incorporate and re-allege paragraphs 1-64 and state further that the plaintiffs prepared materials and designs for the build of an equine fifth wheel trailer;

66. The design was to be utilized for two units to be built for the plaintiffs and no other;

67. The designs and drawings have been reproduced by Forks, distributed, and publicly displayed to the public without the permission of the plaintiffs;

68. Forks is utilizing the designs and other drawings (aka. original works) of plaintiff to profit from the sale of its RV units in the equine market.

COUNT III - Alternative Claim for Quasi Contract

69. Plaintiffs incorporate and re-allege paragraphs 1-68 and state further that the plaintiffs' efforts to promote the Forks RV products in a new market and design work were valuable services that created a reasonable expectation of compensation.

70. The defendants accepted the plaintiffs' efforts and encouraged them to further promote the Forks name and products and

then used the fruits of plaintiffs' labors for their benefit and their benefit only.

71. The actions of the defendants have caused the plaintiffs great financial and emotional hardship, have harmed the plaintiffs' reputations, and have ostracized them from the market with which they are familiar.

WHEREFORE, the plaintiffs pray the Honorable Court:

A. Award damages in an amount of approximately $196,000;

B. Award actual, treble, and statutory damages;

C. Order restitution to plaintiffs;

D. Award plaintiffs interest, costs, and attorney's fees incurred to prosecute this matter

E. Order performance by way of payment of amounts due to plaintiffs;

F. Award any other relief deemed equitable.

I declare that the above and foregoing is true and accurate to the best of my information, knowledge, and belief.

Dated: ______________, 2010

________________________________
Amy Ortega, PLAINTIFF

Dated: ______________, 2010

______________________________
James Ortega, PLAINTIFF

Dated: 7/12____________, 2010

______________________________
Amber Beebe (P66466)
Attorney for Plaintiff
P.O. Box 1984
Portage, MI 49081
amber_beebe@msn.com
(269) 873-4086

THIS PAGE LEFT INTENTIONALLY BLANK

then used the fruits of plaintiffs' labors for their benefit and their benefit only.

71. The actions of the defendants have caused the plaintiffs great financial and emotional hardship, have harmed the plaintiffs' reputations, and have ostracized them from the market with which they are familiar.

**WHEREFORE**, the plaintiffs pray the Honorable Court:

A. Award damages in an amount of approximately $196,000;

B. Award actual, treble, and statutory damages;

C. Order restitution to plaintiffs;

D. Award plaintiffs interest, costs, and attorney's fees incurred to prosecute this matter

E. Order performance by way of payment of amounts due to plaintiffs;

F. Award any other relief deemed equitable.

I declare that the above and foregoing is true and accurate to the best of my information, knowledge, and belief.

Dated: July 15, 2010

Amy Ortega, PLAINTIFF

Dated: July 13, 2010

James Ortega, PLAINTIFF

Dated: July 12, 2010

Amber Beebe (P66466)
Attorney for Plaintiff
P.O. Box 1984
Portage, MI 49081
amber_beebe@msn.com
(269) 873-4086